UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| **In re Federal National Mortgage Association Securities, Derivative and "ERISA" Litigation** ) ) ) ) ) ) | MDL NO. 1668 |
| **In re Fannie Mae Securities Litigation** ) ) ) ) ) | Consolidated Civil Action No. 1:04-cv-01639<br><br>Judge Richard J. Leon |

**DEFENDANT FRANKLIN D. RAINES'S SUPPLEMENTAL
MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS
MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**

Pursuant to the Court's invitation at the conclusion of the November 9, 2005 hearing, we make this submission on behalf of Defendant Franklin D. Raines. We address two points herein: first, we examine the relevant legislative history of the PSLRA and demonstrate why it strongly argues in favor of dismissal here; second, we demonstrate why the principal allegations concerning Mr. Raines that Plaintiffs relied upon at the hearing—those related to Roger Barnes—are insufficient to create an inference of scienter on Mr. Raines's part.

**I.   THE PURPOSE OF THE PSLRA IS TO REDUCE ABUSIVE SECURITIES LAWSUITS FILED WITHOUT ANY EVIDENCE OF FRAUD AND TO PREVENT INJURY TO REPUTATION.**

In 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA") to rein in the "abusive and meritless suits" that were "undermin[ing]" the private securities litigation system. H.R. Conf. Rep. No. 104-369, at 31 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 730, 730.[1] Congress was particularly concerned with abusive lawsuits that were

---

[1] Committee reports are recognized as the most authoritative evidence of legislative intent. *See, e.g.*, *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 395 (1951) (Jackson, J.,

filed because of a change in stock price without any evidence of fraud. Thus, the legislation was prompted in part by the testimony House and Senate Committees heard regarding "<u>the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer</u>, and with only faint hope that the discovery process might lead eventually to some plausible cause of action." H.R. Conf. Rep. No. 104-369, at 31, 1995 U.S.C.C.A.N. at 730 (emphasis added); *see also* S. Rep. 104-98, at 4 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 679, 683 ("These suits, which unnecessarily increase the cost of raising capital and chill corporate disclosure, are often based on nothing more than a company's announcement of bad news, not evidence of fraud."); *id.* at 8, 1995 U.S.C.C.A.N. at 687 ("A complaint alleging violations of the Federal securities laws is easy to craft and can be filed with little or no due diligence. A drop in a public company's stock price, a failed product development project, or even unpredictable adverse market conditions that affect earnings results for a quarter can trigger numerous securities fraud lawsuits against a company.").

Most notably, Congress enacted a "stringent pleading requirement[] to curtail the filing of meritless lawsuits." H.R. Conf. Rep. No. 104-369, at 41, 1995 U.S.C.C.A.N. at 740; *see also* S.

---

Continued ...
concurring) (rejecting the use of legislative history to interpret statutes, except for committee reports, "which presumably are well considered and carefully prepared"); *Am. Airlines, Inc. v. C. A. B.*, 365 F.2d 939, 949 (D.C. Cir. 1966) (citing "the generally accepted maxim of statutory construction that reports by the legislative committees responsible for formulating the legislation must take precedence in event of conflict over statements in the legislative debates on the floors of the houses of Congress"). Conference reports are entitled to the most weight. *Am. Jewish Cong. v. Kreps*, 574 F.2d 624, 629 (D.C. Cir. 1978) ("Since the conclusions in the conference report were commended to the entire Congress, they carry greater weight than other of the legislative history.").

.

Rep. 104-98, at 15, 1995 U.S.C.C.A.N. at 694.  Accordingly, the PSLRA requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See* 15 U.S.C. § 78u-4(b)(2).  In enacting this heightened standard, the Conference Committee noted the particular reputational damage that can be caused when an individual is accused of securities fraud.  "Naming a party in a civil suit for fraud is a serious matter.  Unwarranted fraud claims can lead to serious injury to reputation for which our legal system effectively offers no redress."  H.R. Conf. Rep. No. 104-369, at 41, 1995 U.S.C.C.A.N. at 740.

To address these concerns, Congress provided that plaintiffs must plead particular facts raising a strong inference that each defendant personally acted with scienter in committing a fraud.  The plain meaning of the PSLRA's statutory language is that scienter must be pled for each defendant.  The PSLRA requires that the plaintiff "state with particularity facts giving rise to a strong inference that <u>the</u> defendant acted with the required state of mind." 15 U.S.C. 78u-4(b)(2) (emphasis added).  The Fifth Circuit has held that "[t]hese PSLRA references to 'the defendant' may only reasonably be understood to mean 'each defendant' in multiple defendant cases, as it is inconceivable that Congress intended liability of any defendants to depend on whether they were all sued in a single action or were each sued alone in several separate actions." *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 364-65 (5th Cir. 2004); *see also Phillips v. Scientific-Atlanta, Inc*., 374 F.3d 1015, 1018 (11th Cir. 2004) ("[T]he statute does use the singular term 'the defendant,' and we believe that the most plausible reading in light of congressional intent is that a plaintiff, to proceed beyond the pleading stage, must allege facts sufficiently demonstrating each defendant's state of mind regarding his or her

3

alleged violations. Nor do we perceive that requirement as posing unrealistic burdens on plaintiffs.").

These principles have particular relevance with regard to Mr. Raines. As noted at oral argument—and not disputed—Plaintiffs have failed to identify any accounting judgment that Mr. Raines made or any accounting policy that he developed. Nor have they alleged any fact suggesting that he ever attempted to interfere with the professional judgment of anyone in developing such policies or making such judgments. Yet Plaintiffs here, acting in the wake of a restatement, have sought to tarnish his reputation by cobbling together a heap of allegations and arguing that such allegations create a strong inference that he intended to commit fraud. Despite Plaintiffs' rhetoric, Transcript of the Motion To Dismiss Hearing, Nov. 9, 2005 ("Trans."), at 74, their complaint fails to plead with particularity any facts giving rise to a strong inference of Mr. Raines's scienter. Therefore, the Complaint must be dismissed as against Mr. Raines.

**II.    THE ALLEGATIONS RELATED TO ROGER BARNES DO NOT RAISE A STRONG INFERENCE OF SCIENTER BECAUSE PLAINTIFFS DO NOT ALLEGE THAT MR. RAINES RECEIVED A MEMORANDUM FROM MR. BARNES AND MR. BARNES'S CONCERNS WERE INVESTIGATED AND DISCLOSED.**

At oral argument, Plaintiffs' counsel characterized the concerns raised by former Fannie Mae employee Roger Barnes as the "key warning" that, in Plaintiffs' view, demonstrates that Mr. Raines acted with scienter. *See* Trans at 60. Plaintiffs contend that scienter may be inferred based on the allegations related to Mr. Barnes because Mr. Raines purportedly did "[n]othing," Trans. at 63, in response to Mr. Barnes's allegedly sending a memorandum to Mr. Raines in September 2002 raising concerns, and because, when Mr. Barnes's concerns were undisputedly investigated and found lacking in merit in August 2003, personnel from Fannie Mae's controller's department were "mad at [Mr. Barnes]." Trans. at 69; *see also* Compl. ¶ 135.

4

Given Plaintiffs' almost exclusive emphasis on these allegations (at least with regard to Mr. Raines), a careful review both of what is alleged and what inferences are sought is merited. The Barnes allegations concerning Mr. Raines are contained in paragraphs 13, 120, 131 and 133 of the Complaint. Three factual allegations are made, and three inferences are sought. In no instance do the allegations made support the inferences sought.

### A. Plaintiffs' Allegations that Mr. Raines Received a Memorandum in September 2002 Are Inadequate

First, Plaintiffs make artful allegations that Mr. Barnes "raised" concerns by purportedly "sending" a memorandum to Mr. Raines and Mr. Howard. Plaintiffs allege that Barnes, "in September 2002, . . . raised his concerns in a written memorandum to Defendants Raines and Howard." Compl. ¶ 131. In paragraph 133, Plaintiffs characterize Mr. Barnes as "sending the detailed memorandum to Raines and Howard." *See also id.* ¶ 13 ("In September 2002, Mr. Barnes sent a written memorandum directly to Defendants Raines and Howard . . . ."). Plaintiffs do not allege, however, that Mr. Raines ever received, reviewed, or read the memorandum. Nor do they allege any facts that would lead to that inference, such as how the memorandum was transmitted, or make any allegations giving the Court a reasonable basis on which to conclude that Mr. Raines actually received and reviewed the alleged memorandum.

Even under the pleading requirements of Fed. R. Civ. P. 12(b)(6), the bare allegations that Mr. Barnes "raised . . . concerns" or sent a memorandum would be insufficient to raise a reasonable inference that Mr. Raines received and read the memorandum. And these allegations certainly cannot raise a strong inference that Mr. Raines acted with scienter under the stringent pleading requirements of Fed. R. Civ. P. 9(b) and the PSLRA. *O'Banner v. Bizzell*, No. 92 C 7435, 1995 WL 430911 (N.D. Ill. July 18, 1995), is instructive. In *O'Banner*, the plaintiff, an inmate, alleged that the prison warden had knowledge of his medical condition and the prison

5

hospital's treatment thereof because the plaintiff sent a copy of a letter to the prison's medical director to the warden. *Id.* at *3. The warden moved to dismiss the complaint under Rule 12(b)(6) on the basis that he was not personally involved in the challenged medical decisions. *Id.* at *2-3. The court, citing the plaintiff's failure to allege that the warden ever received or read the letter, as well as the volume of letters received by the warden, refused to infer that the warden ever received and read the letter:

> One may argue that Plaintiff's letter provided [the warden] with knowledge of the decisions at the prison hospital. However, Plaintiff fails to allege that [the warden] read or even received the letter. Although this Court must draw all reasonable inferences in favor of Plaintiff, given the large volume of letters and complaints that a warden receives, the court can not reasonably infer that [the warden] received and read Plaintiff's letter.

*Id.* at *3.

Here, as in *O'Banner*, Plaintiffs do not allege that Mr. Raines ever received or read Mr. Barnes's memorandum. *See* Compl. ¶¶ 13, 131, 133. Even under normal pleading standards, the Complaint should be dismissed because the inference that a memorandum was read and received cannot be inferred from such an allegation. But the argument for such an inference here is even weaker than in *O'Banner*. As an initial matter, the pleading standard is much higher. The Court in *O'Banner* could not even find a "reasonable" inference on such allegations much less the "strong" inference required by the PSLRA.

Moreover, Plaintiffs' allegations must be viewed through the lens of the 2004 OFHEO Report, which Plaintiffs acknowledge is incorporated into their Complaint. Trans. at 116-17. Despite the Report's extensive review of the Barnes allegations, there is no reference to this alleged September 2002 memorandum in the OFHEO Report. *See* OFHEO Report at 73-79. This is so even though the Report makes clear that Mr. Barnes was interviewed by OFHEO on September 1, 2004, only a few weeks before the OFHEO Report was released. *Id.* at 73 n.195.

6

And OFHEO was clearly willing to credit some writings by Mr. Barnes, such as his "Unamortized Balances and Factor Analysis," *id.* at 73 nn.191, 194, and his July 29, 2003 e-mail to Mr. Rajappa, *id.* at 73 n.193. But the OFHEO Report makes not a single reference to Mr. Barnes's allegedly sending an anonymous memorandum to Mr. Raines. This fact, when combined with other inferences that may be drawn from the facts alleged, undermines the notion that a strong inference of scienter can arise from Plaintiffs' conclusory allegations. *See Pirraglia v. Novell*, 339 F.3d 1182, 1187 (10th Cir. 2003) ("[W]e consider the inference suggested by the plaintiff while acknowledging other possible inferences, and determine whether plaintiff's suggested inference is 'strong' in light of its overall context.").[2]

    Plaintiffs contended at oral argument that Mr. Raines knowingly made false statements to analysts during a July 30, 2003 conference call, *see* Compl. ¶ 233, because that call post-dated the alleged Barnes memorandum. Trans. at 67-68. Even accepting Plaintiffs' characterization of Mr. Raines's statements during that call, which misconstrues those statements, *see* Trans. at 77-80, Plaintiffs' attempt to allege that Mr. Raines made false statements with scienter is based on the premise that Mr. Raines received the September 2002 memorandum that Mr. Barnes

---

[2] In addition, given Plaintiffs' failure to allege that Mr. Raines received Mr. Barnes's alleged memorandum, they clearly have not alleged <u>when</u> Mr. Raines received the memorandum. Without an allegation as to when the memorandum was received, and therefore when Mr. Raines allegedly became aware of accounting problems, Plaintiffs cannot allege that Mr. Raines possessed scienter at the time that specific statements were made. As a result, Plaintiffs cannot allege that such statements were made fraudulently. *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) ("To state a claim for securities fraud under Rule 10b-5, a plaintiff must allege that the defendant knowingly or recklessly made a false or misleading statement of material fact in connection with the purchase or sale of a security . . . ."); *see also In re Bally Mfg. Sec. Litig.*, 144 F.R.D. 78 (N.D. Ill. 1992) (finding fraud allegations insufficient to satisfy Rule 9(b) where the plaintiffs failed to allege when a memorandum pointing to serious financial difficulties at the company was received "[b]ecause plaintiffs fail to allege that the memo was received during the class period").

allegedly sent.  As Plaintiffs have failed to allege facts raising an inference that Mr. Raines received the alleged memorandum, Plaintiffs have no basis for contending that Mr. Raines had any reason to doubt the veracity of the statements he made during the July 2003 analyst call.

> **B.    Plaintiffs' Allegations That the Alleged September 2002 Memorandum Apprised Mr. Raines that Fannie Mae's FAS 133 Accounting Was Inaccurate Are Insufficient**

<u>Second,</u> in addition to asking for the inference that Mr. Raines received and read the alleged memorandum, Plaintiffs seek an inference that the alleged memorandum put Mr. Raines on notice that there were a "multitude of problems," Trans. at 67, presumably including problems with regard to the Company's accounting under FAS 133, which forms the bulk of the restated amount.  The OFHEO report makes plain, however, that Mr. Barnes's concerns all related to amortization factors, a subject covered by FAS 91.  *See id.* at 73 & n.194.  Thus, the OFHEO Report references Mr. Barnes's concerns solely in the part of its report entitled "Accounting for Purchase Discount and Premium and Other Deferred Price Adjustments Under <u>SFAS 91</u>."  *See id.* at 1 (emphasis added).  Mr. Barnes's name does not even appear in those parts of the report addressing hedge accounting under FAS 133 and accounting oversight.  Nor do Plaintiffs allege any facts that create a strong inference that an executive should infer that accounting is incorrect generally because concerns are raised about application of a single accounting standard.  There is simply no rational basis on which an executive would conclude that the Company's accounting under FAS 133 was wrong based on reading a memorandum with the contents alleged in paragraph 131 of the Complaint, in which neither the name nor the substance of FAS 133 appears.

Moreover, Plaintiffs' exhaustive complaint fails to make a simple allegation—that the concerns allegedly raised by Mr. Barnes in 2002 relate to the reasons for Fannie Mae restating accounting under FAS 91.  This failure is significant, given (i) that OFHEO's views as to why

8

that accounting was incorrect are made apparent in its 2004 report, and (ii) Plaintiffs contend that Barnes's precise concerns are apparent from his alleged memorandum.

### C. Plaintiffs' Allegations Are Insufficient to Create an Inference that Mr. Raines's Reaction to the Barnes Allegations Demonstrates Scienter

<u>Third</u>, Plaintiffs seek an inference that Mr. Raines knew that a fraud was afoot based on the response to Mr. Barnes's allegations. Plaintiffs make two different arguments in this regard. First, they contend that the investigative response in August 2003 was somehow indicative of fraud. The 2004 OFHEO Report shows, however, that when Mr. Barnes's concerns were raised in July 2003 they were the subject of a detailed response. A review of that report's contents makes the point.

On July 29, 2003, Mr. Barnes e-mailed Sam Rajappa, the head of the Office of Auditing, to request a meeting "regarding analysis and research I have been conducting for a number of weeks." OFHEO Report at 73 n.193. This e-mail came on the heels of the Office of Auditing's amortization audit, which was completed in July 2003. *Id.* at 79 & n.213 (noting that the report on the amortization audit was issued on July 9, 2003). The Office of Auditing convened a meeting on August 8, 2003 to discuss Mr. Barnes's concerns. *Id.* at 73. That meeting was attended by "a number of representatives from different internal groups <u>as well as the external auditors</u>"—KPMG. *Id.* (emphasis added). At the meeting, the Office of Auditing presented its review of the issues raised by Mr. Barnes. *Id.* Mr. Rajappa, the head of the Office of Auditing, presented the conclusion that the process to which Mr. Barnes had objected was GAAP-compliant. *Id.* ("Mr. Rajappa stated that '. . . this process is in compliance with the company's accounting policies that are <u>in compliance with GAAP</u> . . . .'"). *Id.* (emphasis added). Mr. Rajappa specifically asked if anybody present at the meeting objected to the conclusion that the

9

amortization process about which Mr. Barnes raised concerns was GAAP-compliant.  *Id.*  Nobody—<u>not</u> Mr. Barnes and <u>not</u> KPMG—expressed any objection whatsoever.  *Id.*

Mr. Rajappa presented the findings of the investigation—again, that the amortization process was GAAP-compliant—to the Audit Committee of the Board of Directors on August 14, 2003.  *Id.*  In addition, Mr. Barnes's concerns were disclosed to OFHEO prior to the commencement of OFHEO's special examination.  *Id.*  Although OFHEO found fault with the conclusions of the Office of Auditing's investigation into Mr. Barnes's concerns, *see id.* at 73-79, the OFHEO Report nowhere concludes or even alleges that Mr. Raines was made aware of any deficiencies in the investigation.  Nor does it allege that Mr. Barnes's concerns were concealed from Fannie Mae's outside auditor or from OFHEO.  To the contrary, it acknowledges that Mr. Barnes's concerns were disclosed to both KPMG and OFHEO.  *Id.* at 73.  Because the conclusion of this investigation was that the transactions challenged by Mr. Barnes were GAAP-compliant, the Court cannot reach a strong inference that Mr. Raines was aware of accounting improprieties or was extremely reckless in ignoring signs of such improprieties.  The findings of the investigation confirmed OFHEO's and KPMG's repeated reports that Fannie Mae's accounting was proper.  MTD Ex. A at 121; MTD Ex. P at 72; MTD Ex. Q at 34-35.[3]  The only reasonable inference that may be drawn from these facts—and from Plaintiffs' failure to plead that any Defendant withheld any information from KPMG or OFHEO—is that Mr. Raines believed that Fannie Mae's accounting was GAAP-compliant and did not believe that any accounting manipulations were taking place.  Plaintiffs must plead facts giving rise to a strong

---

[3] The statements of KPMG and OFHEO are admitted solely to show that they were made, not that they were true.  Therefore, they are judicially noticeable even under the rule Plaintiffs advocate.  *See, e.g.*, *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) ("[A] court, when considering a motion to dismiss in a securities fraud case, may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents . . . .").

inference of scienter, "an approximation that borders on actual intent." *In re Livent, Inc. Sec. Litig.*, 148 F. Supp. 2d 331, 349 (S.D.N.Y. 2001). This Plaintiffs have failed to do.

Plaintiffs alternatively contend that scienter may be inferred from the fact that no investigation was undertaken when Mr. Barnes allegedly originally sent his memorandum in September 2002. Of course, this is premised on the notion that the allegations of the complaint are sufficient to create an inference that Mr. Raines received and read the memorandum in September 2002, which they are not. *See supra* Part II.A. But even if such allegations were sufficient, the materials incorporated into Plaintiffs' complaint belie the inference that Plaintiffs seek. Fannie Mae made transparent to its auditors and to the public that its accounting under FAS 91 involved significant estimates, Fannie Mae 2002 Annual Report, Ex. 7 to Fannie Mae's motion to dismiss, at 92-93, and Fannie Mae's auditor, KPMG, concluded that Fannie Mae's practices were in accord with GAAP. *Id.* at 121. There is no allegation of obstruction, obfuscation, or non-transparency with regard to this 2002 audit. Thus, even shortly after Mr. Barnes's allegations were purportedly raised, the auditors provided opinions that would have dispelled any concerns.

## CONCLUSION

Aside from a very brief and not at all specific discussion of Mr. Raines's alleged motive to commit fraud, Plaintiffs' counsel's entire oral argument with respect to Mr. Raines relied on Mr. Barnes's allegations in an attempt to establish Mr. Raines's scienter. Trans. at 59-70. The insufficiency of Plaintiffs' motive allegations regarding Mr. Raines has been laboriously briefed and was discussed in detail at oral argument. Therefore, Plaintiffs are left to rest wholly on the Barnes allegations, but those allegations fall far short of establishing Mr. Raines's scienter. Accordingly, Plaintiffs have failed to plead particular facts raising a strong inference of scienter and the Complaint should be dismissed as to Mr. Raines.

Dated: November 23, 2005

Respectfully submitted,

/s/ Kevin M. Downey
Kevin M. Downey (D.C. Bar No. 438547)
Joseph M. Terry (D.C. Bar No. 473095)
Michelle D. Schwartz (D.C. Bar No. 491662)
WILLIAMS & CONNOLLY, LLP
725 Twelfth Street, N.W.
Washington, DC 20005
202-434-5000 (phone)
202-434-5029 (facsimile)

*Counsel for Defendant Franklin D. Raines*

**CERTIFICATE OF SERVICE**

      I certify that on November 23, 2005, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter who are registered on the CM/ECF.

                                        /s/ Michelle D. Schwartz
                                        Michelle D. Schwartz