**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x
                          :

IN RE AMERICAN INTERNATIONAL   :
GROUP, INC. SECURITIES LITIGATION   :    Master File No. 04 Civ. 8141 (JES) (AJP)
                          :

This Document Relates To:         :
All Actions                    :    Jury Trial Demanded
                          :

———————————————————— x

## CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

324.    The following day, on April 1, 2005, in the wake of this news and reports that Defendants Greenberg and Murphy may have been involved in ordering the removal of documents from AIG's Bermuda offices, as well as the destruction of computer files and tape recordings concerning the Company's reinsurance deals, AIG stock dropped another 8 percent, falling from $55.41 to $50.95, on extremely heavy trading.

325.    As alleged in greater detail below, AIG's May 31, 2005 restatement confirmed that the improper transactions described above were ***"done to accomplish a desired accounting result"*** and were not properly disclosed.

326.    As a result of this misconduct, AIG has been investigated by numerous government and regulatory agencies and has been named as a defendant in a civil suit brought by the New York Attorney General.  In connection with these improprieties, SEC civil complaints and charges by the DOJ have been brought against two former General Re executives, alleging that they aided and abetted securities fraud at AIG.  Ultimately, these accounting improprieties at AIG led to an enormous restatement wherein the Company acknowledged that its income had been inflated by nearly $4 billion and that shareholder equity would be reduced by $2.26 billion.

## 1.    AIG Improperly Used A $500 Million Finite Reinsurance Deal with General Re to Falsely Improve Its Financial Statements

### a.    Background on Claims Reserves, Reinsurance and Relevant Accounting Rules

327.    The insurance business is regulated by the states.  The primary purpose of such regulation is to ensure that companies are financially sound and have set aside enough of the premium money to pay claims when they come are made, which often occurs years after the premiums are collected.  The money set aside to pay claims is called "reserves" or "loss reserves."

328. The market pays close attention to fluctuations in insurers' reserves as an indicator of the quality of those companies' earnings. During a period of growth, insurers typically report increased premium income as well as an increase in reserves necessary to cover potential future claims on the new policies being written. If an insurer's premium income increases but its reserves do not (or do not increase at the same pace as premiums), investors tend to worry, fearing that the insurer may not be setting aside sufficient reserves to meet its future obligations under the policies. Indeed, such under-reserving could jeopardize the insurer's long-term financial health.

329. Similarly, a reduction of reserves during a period of premium growth may indicate that an insurer is improperly using its reserves to boost its profits.

330. Reinsurance is what insurers use to buffer against the risks they have assumed, *i.e.*, to help spread the risk and cover the cost of future claims from policies that they have already sold. "Finite" reinsurance – also known as "non-traditional" or "loss-mitigation" insurance – is an aggressive form of reinsurance designed to limit those risks in a manner more profitable than regular reinsurance. Under such transactions, the company passing off the losses usually "borrows" the claims reserves from another company – the reinsurer – and pays the reinsurer for the privilege of doing so.

331. When used properly, finite reinsurance allows insurers to spread their risk of loss on an asset or business over time, and also to distribute risk among other insurers willing to assume that risk in exchange for premiums. ***For such an arrangement to be proper, however, the company buying the reinsurance policy must transfer "significant" risk to the reinsurer selling the policy***. (*See* Statement of Financial Accounting Standards No. 113, Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts.)

332.     However, if such an arrangement fails to transfer sufficient risk to the reinsurer, the agreement does not qualify as "insurance" because GAAP – under FASB 113: Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts –  requires insurance and reinsurance transactions to transfer "significant" risk from one party to another if either intends to account for the transaction as insurance.  ***Without the transfer of significant risk, such a transaction must be accounted for as a financing arrangement, not as insurance***.

333.     If a purported reinsurance transaction is deemed to be a financing arrangement and not insurance, the transaction has to be accounted for as a loan, rather than insurance.  That, in turn, diminishes the assets on the insurer's balance sheet while at the same time increasing its liabilities.

### b.    Background on the AIG-General Re Transaction

334.     In late 2000 and early 2001, AIG and General Re completed a two-part transaction that allowed AIG to book $250 million in premiums revenues and $250 million of claims reserves to its balance sheet for the fourth quarter 2000, and then another $250 million in premiums revenues and $250 million in claims reserves during the first quarter of 2001.

335.     The transaction was between National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), an AIG subsidiary, and Cologne Re, a Dublin unit of General Re.  Pursuant to the deal, Cologne Re transferred to National Union a package of insurance claims and insurance premiums.  National Union received and booked a total of $500 million in premiums revenue and also added $500 million to its claims reserves (thereby inflating AIG's premiums revenue and reserves).  The terms of the transaction appeared to have required AIG to make an additional $100 million of claims payments in the event that those additional losses developed.  However, as alleged below, these additional claims payments were a fiction because AIG bore no risk of having to pay them.

336.    Importantly, the transaction came at a time when investors were concerned about the adequacy of AIG's reserves.  On October 26, 2000, AIG had announced a nine percent increase in net income for the just-ended third quarter, a figure that was in line with market expectations.  However, AIG's stock fell by six percent that day because the market was apparently concerned that two cents out of the per-share income for the quarter were attributable to a reduction in AIG's claims reserves.

337.    Reflecting this sentiment, Dresdner Kleinwort Wasserstein  analyst Kenneth Zuckerberg noted that "the downward pressure on [AIG's] stock" was due, in part, to "concerns about the negative change in P&C [Property & Casualty] loss reserves."  Likewise, Bear Stearns analyst Michael Smith wrote, "Put simply, the reduction in reserves caused some investors to challenge the quality of the company's earnings."

338.    Similarly, Morgan Stanley Dean Witter's October 27, 2000 analyst report highlighted the importance of claims reserves to the market.  The report also cautioned that future decreases in AIG's reserves could be cause for concern. That report stated, in relevant part:

> The market was disturbed by AIG's net reserve decrease of $59 million, $43 million of which related to its Transatlantic Holdings reinsurance subsidiary.  Pass the popcorn, we've seen this movie before . . . to us this looks like a classic buying opportunity.  AIG has reduced reserves twice recently – in the second and fourth quarters of 1999 – and the market reacted badly then as well.  AIG bounced back in both cases because 1) like today, the explanation for the reserve decline seems reasonable and 2) ***more important, no "other shoe" ever dropped.  We don't believe another shoe will drop this time either.***
>
> ***We do care a lot about reserves, and if we saw a steady trend of unexplained releases during a period of premium growth, we'd definitely be concerned.***  But that's not the case here.

339.    The AIG-General Re deal also came at a time when AIG was preparing to bid for American General, a life insurance company that had been the subject of a competing offer from an AIG rival, Prudential of Britain.  AIG wanted to keep its share price high in order to acquire American General with as few AIG shares as possible.  In fact, as alleged in greater detail below, in order to avoid paying American General shareholders a significant premium on the acquisition, AIG's share price had to trade above a certain range.

340.    On March 18, 2005, *CBS MarketWatch* published an article entitled, "AIG to Reveal Details of Gen re Deal."  The article stated, in relevant part:

> ***There's also concern that the Gen Re deal may have helped AIG manipulate its results at a time when it was trying to acquire a large rival called American General.***
>
> U.K. insurer Prudential Plc announced an agreement to buy American General for $26.5 billion on March 12, 2001.  AIG trumped that offer and ended up finalizing the acquisition in late August that year.
>
> ***AIG's bid depended on its shares trading within a specific range,* The New York Times *reported on March 15.  If the stock dropped too far, the acquisition would have collapsed, the newspaper added.***
>
> ***The Gen Re transaction helped support AIG's share price because it allowed the company to artificially inflate premiums and reserves without knocking reported earnings over two quarters in late 2000 and early 2001***, according to the report.
>
> "If regulators tie earnings and stock manipulation to an acquisition that would be a major concern," A.G. Edwards' Newsome said.

341.    Likewise, on March 28, 2005, *The New York Times* reported that the "[New York] attorney general's office said the [General Re] deal ***artificially increased AIG's premium reserves and helped [AIG] acquire another company***."

c.    **The Government Begins Investigating AIG's
Accounting for the General Re Transaction and
<u>Some Details of the Improper Deal Are Disclosed</u>**

342.    As alleged above, on February 14, 2005, AIG announced that it had received

subpoenas on February 9, 2005 from both the SEC and the NYAG.  AIG described the

subpoenas as "relating to investigations of non-traditional insurance products and certain

assumed reinsurance transactions *and AIG's accounting for such transactions*."

343.    The price of AIG stock fell 2.2 percent on this news, from $73.12 to $71.49, on

heavy trading.

344.    The subpoenas had been prompted by the NYAG's and the SEC's investigation

into General Re in late-December 2004 and early-January 2005.  On December 30, 2004,

General Re had announced that it had received a request from the SEC for "documentation and

information relating to non-traditional or loss mitigation products."  One week later, on January

6, 2005, General Re announced that it had received a subpoena from the NYAG seeking

"virtually identical documents and information" sought the prior week by the SEC.

345.    On March 4, and March 8, 2005, *The Wall Street Journal* reported that the DOJ

had joined in the SEC and NYAG investigation into the AIG-General Re transaction, in part

*because Defendant Greenberg had personally initiated the transaction* by calling General Re's

then-chief executive, Defendant Ferguson, in late 2000 to set up the deal.

346.    On March 15, 2005, AIG announced during a conference call with investors and

analysts that the Company could not rule out a finding by PwC, AIG's outside auditor, that there

was a "material weakness" in AIG's internal controls.

347.    Internal controls are a company's policies for ensuring that all its assets, liabilities

and transactions are properly accounted for.  AIG's 2004 Form 10-K defines a "material

weakness" as a "control deficiency, or combination of control deficiencies, that results in more

than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected."

348.    In response to this news on March 15, 2005, the price of AIG stock fell 3 percent, from $63.85 to $61.92, on heavy trading.

349.    On March 16, 2005, *The Wall Street Journal* reported that AIG placed Defendant Christian Milton, a vice president for reinsurance, on leave for having helped execute the deal with General Re.   That same news article also reported that an e-mail from a top General Re executive referred to a conversation in which Milton said that ***Defendant Greenberg's motivation for the General Re deal was to add to AIG's claims reserves***.[2]

350.    The March 17, 2005 edition of *Business Week* quoted one source close to the investigation as saying (referring to the AIG-General Re deal): "***[Greenberg] personally asked for this.  He was doing something to defraud investors by cooking the books and changing the outcome***."

351.    On March 17, 2005 (and later on March 23), *The Wall Street Journal* reported that the New York State Department of Insurance ("NYDOI") had joined the NYAG's and SEC's investigation and that the probe had widened to include additional accounting issues, in particular AIG's transactions with two off-shore reinsurance companies, Defendants Richmond

---

[2]    Also on March 16, 2005, *The New York Times* reported that AIG and General Re may have engaged in additional improper transactions.  The *Times* reported that International Lease Finance Corporation, a wholly-owned AIG subsidiary that typically accounts for nearly 10 percent of AIG's overall earnings, purchased a "residual value" or "legacy" insurance policy from General Re during the Class Period.  The transaction was undertaken to allow International Lease to reduce, by at least hundreds of millions of dollars, the amount of debt the company had taken on in relation to airplane leases.  However, the transaction also contained a provision in which International Lease effectively guaranteed that General Re would not suffer any losses from a decline in the value of the planes.  Not only was International Lease able to reduce its reported liability on the aircraft, but the transaction allowed the company to treat the leases on the planes as financial leases, which allowed International Lease to recognize income from the leases more quickly than it otherwise could.

and Union Excess.   Richmond, based in Bermuda, and Union Excess, based in Barbados,

together reinsured approximately $1.2 billion of AIG's expected future claims, known as

"recoverables," as of the end of 2003.

352.    AIG stock continued to drop on this March 17, 2005 news, falling from $62.90 to

$60.80, a 3.3 percent decline.

353.    On March 21, 2005, AIG fired Milton, along with Defendant Smith, after both

men signaled they would invoke their Fifth Amendment rights against self-incrimination when

being interviewed by government regulators.

### d.    AIG Admits That It Misled Investors and Regulators

354.    *On March 25, 2005, The Wall Street Journal reported that AIG had uncovered*

*at least 30 transactions with a dozen or more off-shore reinsurance companies – including*

*Richmond and Union Excess – that AIG may have improperly accounted for.*

355.    On March 27, 2005, *AIG fired Defendant L. Michael Murphy, a longtime AIG*

*executive and confidante of Defendant Greenberg* who worked at American International Co., a

Bermuda-based unit of AIG that provides management services to other insurers.  Defendant

Murphy, an AIG lawyer who helped the Company set up numerous off-shore insurance-related

entities in Bermuda, had reportedly been terminated *for not cooperating with AIG's internal*

*investigation into the Company's reinsurance transactions.*

356.    *On March 28, 2005, The Wall Street Journal reported that as many as 12 AIG*

*executives had been subpoenaed by the SEC in connection with its investigation, and that as*

*many as 30 AIG executives had knowledge of the financial transactions at issue.*

357.    That so many high-level AIG executives would be implicated in AIG's

reinsurance transactions – in addition to Defendant Greenberg's personal involvement in the

General Re deal – is not surprising.  In fact, AIG's senior management is intimately involved in

the Company's reinsurance agreements via AIG's internal reinsurance "security committee."

According to AIG's SEC filings:

> **The utilization of reinsurance is closely monitored by an internal reinsurance security committee, consisting of members of AIG's senior management.**  No single insurer is a material reinsurer to AIG nor is AIG's business substantially dependent upon any reinsurance contract.

> \*      \*      \*

> **AIG's Reinsurance Security Department conducts ongoing detailed assessments of the reinsurance markets and current and potential reinsurers, both foreign and domestic…. This department also reviews the nature of the risks ceded and** the need for collateral.  In addition, AIG's Credit Risk Committee reviews the credit limits and concentrations with any one insurer.

> \*      \*      \*

> **AIG evaluates the financial condition of its reinsurers through an internal reinsurance security committee consisting of members of AIG's senior management.**

358.    On March 29, 2005, *The Wall Street Journal* reported that, on March 28, 2005, AIG's outside counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), met with the SEC, NYAG and NYDOI.  Paul, Weiss reportedly told the regulators that they were reviewing numerous AIG transactions with reinsurers other than General Re, including AIG's dealings with Union Excess and Richmond.  Paul, Weiss also reportedly informed the government that **they had uncovered evidence that AIG had misled investors and regulators in the Company's regulatory filings**.

359.    According to *The Wall Street Journal*, on or about March 29, 2005, Paul, Weiss told those same regulators via conference call that **the Company had intentionally given false information to the NYDOI during a routine inspection of AIG's property-casualty business earlier this year**.  The NYDOI had reportedly been seeking information about an AIG

reinsurance deal from 2000 or 2001, focusing on whether AIG had transferred enough risk to the

reinsurer to allow AIG to account for the transaction as "insurance" (rather than the less-favored

accounting treatment for a loan).  The Journal reported that the information AIG provided in

response to the NYDOI was *"intentionally false"*:

> [Paul, Weiss] told the authorities that AIG officials had
> exaggerated the degree to which risk was transferred to the
> reinsurer . . . In describing other findings from AIG's internal
> probe, [Paul, Weiss] said they had uncovered evidence suggesting
> that past filings were misleading.  *But in this case, [Paul, Weiss]*
> *admitted that the information provided during the [NYDOI]*
> *examination earlier this year was intentionally false and not an*
> *honest mistake*.

> e.    **AIG Admits Improperly Accounting for Its Transactions**
>       **with General Re, Union Excess, Richmond and Others**

360.    On March 30, 2005, the last day of the Class Period, *AIG issued a press release*

*in which the Company acknowledged that the General Re transaction had been improperly*

*recorded*:

> *Based on its review to date, AIG has concluded that the Gen Re*
> *transaction documentation was improper and, in light of the lack*
> *of evidence of risk transfer, these transactions should not have*
> *been recorded as insurance.*  Therefore, AIG's financial
> statements will be adjusted to recharacterize such transactions as
> deposits rather than as consolidated net premiums.

361.    The press release also warned that the Company's internal review was not yet

complete, and further announced that:

> In preparation for the issuance of the Form 10-K, management
> reviewed the accounting treatment for certain additional items with
> its independent accountants.  Some of these matters were
> subsequently disclosed by AIG to various federal and state law
> enforcement and regulatory authorities.  The continuing review
> had led AIG management to conclude that the accounting for

certain of these matters may need to be recharacterized or otherwise adjusted. ***Certain but not all of the original characterizations resulted from transactions which appear to have been structured for the sole or primary purpose of accomplishing a desired accounting result***.

362.    As previously stated, on this news, AIG stock dropped 3 percent, from $57.16 to $55.41, on heavy trading.

363.    As discussed in greater detail below, AIG also announced that it had discovered evidence showing that it controlled Richmond and possibly Union Excess, two off-shore reinsurers previously represented to be entities that were independent of AIG.  The Company's press release indicated that consolidating the two reinsurers on AIG's financials would result in a reduction of ***approximately $1.1 billion in AIG's consolidated shareholders' equity*** as of December 31, 2004.

364.    AIG also announced several other accounting problems, in light of which the Company disclosed that it:  (i) will consolidate Capco Reinsurance Co., a Barbados reinsurer, and rebook $200 million as underwriting losses instead of capital losses; (ii) was reviewing estimates relating to deferred acquisition costs at its general-insurance and financial-services units, and may take a charge of about $370 million for associated revisions; (iii) found misclassified investment-income items, which resulted in an improper increase of net investment income by about 4 percent from 2000 through 2004; and (iv) planned to expense deferred compensation granted to AIG executives through SICO.

365.    In total, AIG estimated that its financials required a restatement of (or charge to) earnings that ***could lower the Company's net worth by $1.77 billion***.

366.    AIG's March 30, 2005 press release also announced that the Company's 2004 10-K would be delayed until April 30, 2005 – beyond the March 31, 2005 extended due date – "in

order to provide AIG, its Board of Directors and its new management adequate time to complete their extensive review of AIG's books and records."

367.    On April 8, 2005, *The New York Times* reported that Defendant Greenberg himself had initiated the AIG-General Re deal by calling General Re's then-CEO, Ronald Ferguson, on October 31, 2000.  *The Wall Street Journal* also reported that day that, ***"[i]n the call, Mr. Greenberg told Mr. Ferguson he wanted to do a deal with General Re to boost AIG's reserves for the coming quarter***, and said General Re would receive a fee, according to people familiar with the situation."  That same article also reported that, in a later phone call to Warren Buffett – the CEO of Berkshire Hathaway, General Re's parent company – ***Ferguson recounted Greenberg's frustration with Wall Street's criticism of AIG's reserve levels***.  Ferguson also reportedly told Mr. Buffett that he and Greenberg had come up with a deal to address the problem.

368.    On April 3, 2005, Greenberg's personal lawyer, David Boies, appeared on the Charlie Rose Show on PBS.  Mr. Boies, commenting on the Company's March 30 disclosures, stated that AIG's accounting was "not something that goes to the integrity either of the company or the man [referring to Greenberg]." Mr. Boies added that the General Re transaction is "not a hole in the balance sheet.  It's not fraud." When asked whether Greenberg thought he was breaking the law, Boies responded, "No, absolutely not."

369.    Appearing on ABC's "This Week with George Stephanopoulos" on April 10, 2005, Attorney General Spitzer took issue with Mr. Boies' statements.  Mr. Spitzer described AIG as ***"a black box run with an iron fist by a CEO who did not tell the public the truth***. That is the problem."  He also stated: ***"These are very serious offenses, over a billion dollars of accounting frauds that AIG has already acknowledged,"*** and that the ***"evidence is***

*overwhelming that these were transactions created for the purpose of deceiving the market. We call that fraud. It is deceptive. It is wrong. It is illegal*."

370.    The next day, April 11, 2005, Mr. Buffett was interviewed by the SEC and NYAG in connection with his knowledge of the AIG-General Re deal.  Mr. Buffett reportedly told the regulators that he was never given details of the transaction, nor did he ever see the actual contracts.  However, as reported by *The Wall Street Journal* on April 12, 2005, **Mr. Buffett confirmed that "Hank [Greenberg] knew about the deal" between AIG and General Re.**

371.    One day after Buffett's interview, Defendant Greenberg appeared for a deposition before the SEC, DOJ and NYDOI.  However, **he repeatedly invoked his Fifth Amendment right against self-incrimination and refused to answer the government's questions**.

372.    A May 4, 2005, *Wall Street Journal* article indicated that the Federal Bureau of Investigations had begun conducting criminal probes of accounting at insurance companies, including AIG. That article read, in relevant part:

> FBI field officers congregated in Washington, D.C., last week to discuss the topic of improper accounting gimmicks and whether they were widely used across the insurance industry, Mr. Swecker said.  As for AIG, he said that FBI agents are for now "standing by" as New York Attorney General Eliot Spitzer, working with the Justice Department, conducts an investigation.
>
> "I would not classify that as a full-blown investigation on our part," Mr. Swecker said.
>
> Brian Lamkin, Chief of the FBI's financial crimes section, said his office was coordinating with the SEC and state insurance commissioners in a probe of the insurance industry.

373.    As detailed below, AIG's massive May 31, 2005 restatement – as well as the litany of civil and criminal proceedings brought in connection with the government's investigation into AIG's reinsurance dealings – confirmed that the AIG-General Re transaction,

among numerous others, had been accounted for improperly and with the purpose of misleading investors in order to inflate the price of AIG's stock.

### f.    Full Details of the AIG-General Re Deal Emerge

374.    The details of the General Re transaction as reported in the media were later confirmed and clarified by: (1) a civil complaint the NYAG filed against AIG, Greenberg and Smith on May 26, 2005; (2) the SEC's June 2005 civil complaint against Defendants Houldsworth and Napier, and (3) documents filed in connection with the criminal proceedings the DOJ brought against Defendants Houldsworth and Napier.  Together, all these documents showed the following.

### i.    Greenberg Initiates the Improper AIG-General Re Deal

375.    AIG, and Defendant Greenberg in particular, were keenly aware of the market's concerns about the level of the Company's claims reserves after its October 26, 2000 earnings announcement.

376.    On or about October 31, 2000, AIG's Vice President for Investor Relations sent Greenberg several third quarter analyst reports and noted the concern about the decline in reserves.

377.    That same day, a memorandum was written – apparently by AIG's Vice President of Investor Relations – entitled, "AIG-MRG Request."  The memorandum lists as the proposal – apparently articulated by Defendant Greenberg – "GCR transfer $200m - $500m of reserves to AIG for a six to nine month period."  The memorandum states that the need for the reserves may have been "in response to analysts' negative reaction to AIGs [sic] reserve reduction at Q3."

378.    The memorandum memorializes several persons' "thoughts." For example, under "REF Thoughts," referring apparently to Defendant Ferguson, the memorandum stated: "Due diligence is important, make certain we do not create (reporting) problems of our own."  Under

"JPB Thoughts" – referring apparently to General Re's current CEO, Joseph P. Brandon – the memorandum reads that it "[m]ay be best to stay away from the US companies to avoid large fluctuations in our reported reserves. Use non-US entities. KR Dublin?"

379.    The memorandum also states: that "Chris" – apparently referring to Christian Milton – "only want[s] reserve impact"; that Greenberg had called Milton earlier for a status report on the proposal; and that Milton "*confirmed that [the proposal] is to address the criticism they received from the analysts.*"

380.    Defendant Greenberg called Defendant Ronald E. Ferguson – at the time, the CEO of General Re – on or about October 31, 2000 to solicit help in structuring a transaction between AIG and General Re that would transfer between $200 million and $500 million of claims reserves to AIG through a reinsurance agreement between the two companies.

381.    Greenberg suggested to Ferguson that General Re purchase reinsurance from AIG because that would allow the Company to show increased reserves.  Greenberg explained that, given the market's concerns about AIG's claims reserves, the transaction would only need to last for six to nine months.   Ferguson responded that the proposal would be highly unusual, given that General Re was in the business of *selling* – not buying – reinsurance.  Accordingly, the two men discussed the possibility of AIG paying General Re a fee for its role in the transaction.

382.    During the October 31, 2000 phone call and subsequent conversations, *Defendant Greenberg made clear to Ferguson that any such transaction, while increasing AIG's claims reserves, would not require AIG to assume any actual insurance risk.  Ferguson understood that what Greenberg was describing was not a bona fide reinsurance transaction – which would have required AIG to assume actual insurance risk from General Re – but rather a transaction that would only look like reinsurance for AIG's accounting purposes.*

- 109 -

ii.    **Senior AIG and General Re Executives Negotiate
and Structure the Transaction With Full Knowledge It
Involved No Real Transfer of Risk**

383.    In early November 2000, Ferguson – in consultation with Elizabeth Monrad

("Monrad"), General Re's then-CFO, and Defendant Napier, a Senior Vice President at General

Re's Stamford, Connecticut office – decided to enter into the deal that Greenberg requested.

Defendant Houldsworth, the CEO of Cologne Re Dublin ("CRD"), a General Re subsidiary in

Dublin, Ireland, was also later tasked with helping put together the transaction.  Defendant

Greenberg designated Defendant Milton as the lead representative for AIG on the matter, though

Defendants Smith and Castelli were also involved in making the deal happen.

384.    Given the improper nature of the transaction, Defendant Ferguson – in an email to

Defendant Houldsworth and others – instructed those involved with the AIG-General Re

transaction to keep the matter confidential: "Note to all – let's keep the circle of people involved

in this as tight as possible."

385.    Similarly, the cover note to the underwriting file for the transaction stated:

> Specific guidance has been received from [Ferguson] that ***this file
> is to be kept confidential and consequently to be kept locked in [a
> CRD underwriter's] desk at all times.***  Permission to review this
> file is to be sought from the [CRD underwriter], [Ferguson,] John
> Houldsworth or [the CEO of Cologne Re Germany].  In CRD the
> only personnel authorized to review the file are [the CRD
> underwriter], John Houldsworth and [Houldsworth's assistant].

386.    For approximately two months, Houldsworth, Napier, Monrad and others at

General Re worked with Milton to structure the deal using two contracts between CRD and

National Union, an AIG subsidiary that was to actually receive and book the claims reserves

added pursuant to the contracts.

387.    Defendant Milton conveyed to Napier what Greenberg wanted, and Napier then

worked with Milton, Houldsworth, Monrad and others to structure the transaction accordingly.

388.    The final product that was ultimately produced consisted of two separate "retrocession" contracts[3] between National Union and CRD.  Under the two contracts, the first of which was effective December 1, 2000 (the "First Contract") and the second of which was effective March 31, 2001 (the "Second Contract") (both as the "Contracts"), National Union purported to reinsure CRD for a total of $600 million in losses in exchange for CRD's payment of $500 million in premiums.

389.    Although the First Contract contained an effective date of December 1, 2000, the actual terms of the contract were not agreed to until late December 2000, and the contract was not signed by the parties until August 2001.  Similarly, the Second Contract – which had an effective date of March 31, 2001 – was not signed by the parties until September 2001.

390.    On the face of each contract, National Union reinsured CRD for up to $300 million in losses, which CRD "is or becomes obligated to pay under the Original Reinsurance Contracts written by [CRD]."

391.    According to the Contracts, CRD was to pay National Union $250 million in premiums per contract, for a total of $500 million in premiums.  Of the $500 million in premiums, $490 million was on a "funds withheld" basis (*i.e.*, the money was never paid to National Union but was retained by CRD) and $10 million was supposedly "paid" to National Union.  In fact, however, the $10 million was pre-funded by National Union in a side deal described in greater detail below.

392.    According to the language on the face of the Contracts, AIG was assuming insurance risk of $100 million over and above the amount of premiums the Company was to receive.  ***However, the additional $100 million of risk was a fiction, having been added by***

_____

[3]    "Retrocession" is, in essence, the reinsurance of reinsurance – a transaction in which a reinsurer cedes to another reinsurer all or part of a reinsured risk that the ceding reinsurer had previously assumed.

*Houldsworth – with Defendants Milton's and Napier's knowledge and approval – to give the appearance that risk was being transferred under the arrangement. All parties to the transactions understood that AIG was, in reality, only obligated to pay a total amount of $500 million in losses, which was equal to the amount of premium the Company was receiving from General Re.*

393.    The Contracts also failed to reflect the following side agreements developed by Houldsworth and others with Milton:  (i) that AIG would pay General Re $5.2 million in fees for putting the deal together; (ii) that in order to pay General Re its $5.2 million fee and pre-fund the $10 million in "premiums" CRD was obligated to pay to National Union, General Re and AIG commuted a separate, unrelated reinsurance contract – between General Re and another AIG subsidiary, Hartford Steam Boiler Inspection and Insurance Company ("HSB") – to hide the true reason for the transfer of funds between AIG and General Re; and (iii) that General Re created a fake paper trail to make it appear as though *General Re* had solicited the Contracts (despite the fact that AIG had initiated the transaction).

394.    On or about November 7, 2000, Napier distributed a memorandum to Ferguson, Monrad, General Re's then-Head of North American Operations, and three other senior-level General Re employees.  The memorandum contained the subject line, "MRG" (*i.e.*, Defendant Greenberg) and attached the October 27, 2000 analyst report described above.  Napier's memorandum stated:

> Based upon [the analyst's] numbers, AIG reduced reserves $59m.
> It will be interesting to understand more about the $500m figure
> [AIG has] been using for [the proposed deal with General Re].
> Perhaps [AIG is] planning for further releases in Q4 [2000] and are
> seeking a means to offset the cosmetic impact.

395.    In an email exchange between Ferguson and an undisclosed General Re executive on November 6 and 7, 2000, the executive notes on November 6 that "Chris" (referring

apparently to Christian Milton) had changed the transaction from one with a "6 to 9 month duration" to one with "a 24 month term with a declining balance." The emails' subject line is entitled, "MRG Request 10/31/00 – Update." The same executive later tells Ferguson that "[w]e are pushing to meet Chris' commitment to MRG that we will have general ideas by the end of the week" and that "[t]he next step will be to meet with AIG representatives to discuss the details of the structure."

396.    After initial discussions about how to structure the deal, Monrad and Napier turned to CRD, a General Re subsidiary in Ireland, to effectuate the transaction. On or about November 13, 2000, Monrad called Houldsworth – the CEO of CRD and the Chief Underwriter for the "Alternative Solutions" business unit of General Re – and told him about the proposed transaction.

397.    On November 15, 2000, Houldsworth emailed Monrad, Napier and others at General Re, attaching a draft slip or "term sheet" for the deal and a cover email which summarized the issue as "can CRD provide a retrocession contract transferring approximately $500m of reserves on a funds withheld basis to the client *with the intention that no real risk is transferred* and that this may well be commuted or gradually reduced in a few years."

398.    In the same email, Houldsworth also stated:

- "[The] reserves [ceded by CRD to AIG] should be fairly stable."

- "We must maintain underlying client confidentiality and will not allow [AIG] to inspect our records or receive detail in loss reports of contract structures and loss profiles. . . . We must maintain our ability to manage our portfolio freely without interference or notification to [AIG]."

- *"Given that we will not transfer any losses under this deal it will be necessary for [AIG] to repay any fee [(i.e., premium paid by CRD)] plus the margin they give us for entering this deal*."

- 113 -

399.    Napier's contemporaneous handwritten notes regarding the AIG-General Re deal refer to a "non risk deal," a "side deal" to repay CRD its fee and premium paid to AIG, and that CRD "pay[s] AIG $10M fee [*i.e.*, premium]; AIG pay[s CRD] $10M fee back + fee for deal."

400.    Houldsworth proposed structuring the Contracts so that they *appeared* to transfer $100 million in insurance risk from General Re to AIG.  This was done to allow AIG to record the $500 million in claims reserves, even though the parties to the contracts knew that the $500 million in losses being transferred (*i.e.*, "reinsured" by) AIG, through National Union, lacked the sufficient transfer of risk to qualify as reinsurance for accounting purposes.

401.    On or about November 14, 2000, Houldsworth told a number of his colleagues at Cologne Re and in the Alternative Solutions Group that Monrad told him that AIG had taken down its claims reserves to increase the Company's third quarter 2000 results and wanted to hide their claims reserves reductions at year-end by "borrowing" reserves from General Re. Houldsworth also stated that the transaction had to be done outside the United States so that it would not be apparent that General Re was accounting for the transaction differently than AIG.

402.    In a November 14, 2000 telephone conversation between Houldsworth and Monrad, Houldsworth suggested adding $100 million in purported risk to the Contracts:

> I was thinking of doing something like a 600m, well [AIG] might not accept this, I presume they need risk transfer to put on the thing!  So something like a 600m limit for 500m, obviously, underlying reserves 500m . . . . The only question is, in my viewpoint, clearly we got to have risk transfer in there.

403.    However, both Monrad and Houldsworth knew that Defendant Greenberg wanted a transaction without the transfer of risk, and that there was no risk associated with the losses they were proposing to have AIG reinsure.  In that same conversation on November 14, 2000, the following exchange took place:

Monrad:         So let's assume they take the deposit liability I will tell you any way we structure it yes it's got to look more like deposit ***because they are not really looking to take risks!***  Well I think if we spend a lot of time trying to figure out how to transfer 500m of risk, we won't get this deal done in the time they want.

Houldsworth:    Yeah, I mean as you say, if there's enough pressure on their end, ***they'll find ways to cook the books won't they***?! [Monrad laughs] It's no problem there, it's up to them!  We won't help them to do that too much.  We'll do nothing illegal!

404.    On November 15, 2000, Houldsworth, Monrad and Napier had another conversation about the deal wherein they again acknowledged the lack of risk being transferred to AIG in the transaction and identified the resulting need for a "handshake" deal between the Company and General Re:

Houldsworth:    ***There is clearly no risk transfer.  You know there is no money changing hands***.

Monrad:         ***[AIG] may have a tough time getting the accounting they want out of the deal that they want to do. . .   They are not looking for real risk***…

                            *       *       *

Napier:         [W]hat would happen if we just did this where there was no risk?  I mean we just charge them a fee for doing this deal.

Houldsworth:    Well what I was thinking is if you know, we charge them, if we give them a fee on this, my idea would be for them to, they would have to come to you and say what that fee is plus some sort of margin, you must have agreed to give that to us before we will sign this deal, or at the same time as we sign this deal so you know, net, we get our margin and I think it's just the same thing, but I think to give them a deal with no risk in it and just charge them a fee you can assume their auditors are being pushed in one direction, but I think that's going too far.  I think that's detail, you know they are going to come

- 115 -

> to that and if they suggest it, then fine, ***but I just***
> ***can't see how on earth anybody, you know we can***
> ***charge the 500m for a 500 limit and get them to***
> ***book that as a reserve but I would be staggered if***
> ***they get away with that.***

Napier:    ***Then the way to do this, if there is risk in this, the***
           ***way to become whole requires [Greenberg] and***
           ***[Ferguson] to have a handshake.***

405.    In a telephone call that same day about arranging a meeting with AIG about the

transaction, Napier said to Houldsworth and Monrad:

> So it just seems to me [that setting up a meeting at AIG is] the next
> step here and ***[Greenberg is] calling daily on this***.  He's pretty
> excited about it so it would not be a problem to get a team of AIG
> people together in the next day or two [to discuss what General Re
> has come up with as the potential transaction].

406.    On November 17, 2000, Defendant Greenberg again called Defendant Ferguson

to discuss the deal.  Ferguson told Greenberg that he thought that General Re had put together a

structure that would accomplish Greenberg's objectives.  ***They also discussed the fact that AIG***

***would "not bear real risk" in the transaction and that AIG would end up paying General Re a***

***$5 million fee***.

407.    On or about November 17, 2000, Napier emailed Milton and Monrad a draft slip

of the proposed transaction.  The email contained the subject heading "Project A", and Napier

included an overview that said, in relevant part:

> As I mentioned this afternoon, Ron's discussions with MRG
> established the following points:
>
> -   The Dublin structure outlined below [in attached slip] appears
>     workable.
>
> -   You may want to divide the transaction into two parts – one for
>     2000 and one for 2001.
>
> -   The fee to [General Re] will be 1% or $5m.

- 116 -

- We need to work out a mechanism for [General Re] to recover the 2% fee advanced to AIG under the agreement.

- ***You, Howie Smith, [Monrad] and I have been appointed to work out the details***.

- A point that may not be sufficiently clear in the discussion document is the term of the agreement. In accordance with our conversations, we anticipate terminating the agreement at 24 months via a communication."

408.    Several weeks later, in late November or early December 2000, Defendants Smith, Castelli and Milton (and others at AIG) met with Monrad, Napier and another General Re executive at AIG's offices. At the meeting, the AIG executives were told that General Re was going to account for the transaction differently than AIG – *i.e.*, that General Re would be accounting for the losses as deposits,[4] whereas AIG intended to account for the portfolios as reinsurance.

409.    On or about December 7, 2000, Napier told Houldsworth that Greenberg had agreed to pay General Re a $5 million fee for the transaction.

410.    Also on December 7, 2000, Napier emailed Houldsworth and Monrad. Napier informed them that Milton had agreed that AIG would proceed with the transaction as outlined in the draft slip and in accordance with the conversations between Greenberg and Ferguson, and that the transaction would be completed in two installments of $250 million each, one in late-2000 and one in early 2001. Napier's email read, in relevant part: "Chris called this morning to say they want to proceed as outlined in John's slip and in accordance with REF's conversation with MRG. Two installments, $250m each, one for '00, the other in '01."

---

[4]    In other words, most of the CRD loss portfolios being used for the transaction were *already* reinsured and the losses in the portfolios were not expected to exceed the amounts available to pay the associate claims. Thus, CRD already accounted for those loss portfolios as deposits – *i.e.*, money CRD owed to those being insured by CRD – and not as reinsurance reserves.

411.    In a conversation on December 8, 2000, Monrad told Houldsworth and Napier that she had had told Milton that General Re had accounted for the losses as deposits and that therefore "there would not be symmetrical accounting." ***In other words, Milton fully understood that General Re did not intend to account for the Contracts as reinsurance***:

| | |
|---|---|
| Monrad: | ***We told AIG that there would not be symmetrical accounting here***. |
| Houldsworth: | Okay, fine. |
| Monrad: | ***We told them that was one of the aspects of the deal they would have to digest***. |
| Houldsworth: | That's fine then.  That should do it, shouldn't it?  It's so unlikely to be an issue so . . . |
| Monrad: | ***We haven't heard any push back from them in terms of can you change this, change that so*** . . . |
| Napier: | ***It's quite to the contrary.  When [Milton] called he said we're going to take it as*** - - |
| Monrad: | ***It's a go***. |
| Napier: | ***- - we like it***. |
| Houldsworth: | Okay.  Okay. |
| Monrad: | Done. |

412.    In an effort to make the $500 million AIG-General Re transaction appear legitimate, Houldsworth – in a December 8, 2000 email to several General Re employees – queried whether CRD "need[s] to produce a paper trail offering the transaction to the client?"

413.    On or about December 11, 2000, Napier told Houldsworth that AIG did, in fact, want an offer letter so as to create a paper trail.  When Houldsworth mentioned that he would put Napier's name on the letter to AIG, ***Napier replied, "that way you've really got me on the hook, I'm right there with you."  Napier added that the letter was a good idea because then AIG would have something in their files and "everything ought to be pretty clean."***

414.    On December 20, Houldsworth had a subordinate send an email to Milton that attached a draft term sheet for the AIG-General Re transaction, as well as a December 12, 2000 draft letter from Houldsworth to Milton.  The draft letter – which read, in part, "I hope that I can give you a little more background on the proposal we hope that you will be able to help us with" – implied that *General Re had approached AIG* about the transaction, when if fact just the opposite was true.  The draft letter later was later signed by Houldsworth in final form, dated December 17, 2000.

415.    On December 27, 2000, Houldsworth faxed and emailed Milton a separate letter with the same false implication.  The letter read, in relevant part:

> We are encouraged that you believe AIG will be able to provide us with cover for [reinsurance transactions] that we originally had in mind. . . .
>
> Consequently we have drafted a contract wording for discussion purposes which I have attached for your examination. You will note that the Reinsurer's participations have been amended in Schedule A to reflect your agreement to accept $250m of current liabilities with a maximum exposure of $300m . . .
>
> I hope that on review of the draft agreement you will be able to support this cover and look forward to hearing from you shortly with your initial comments.

416.    The next day, Milton confirmed in a phone call to Houldsworth and Napier that Milton had received the December 27, 2000 letter and that he would be emailing Houldsworth that same day to accept General Re's "proposal."

417.    On or about December 28, 2000, *Houldsworth asked a senior General Re finite reinsurance executive "how much cooking goes on" at AIG; Houldsworth was told, "they'll [AIG] do whatever they need to make their numbers look right."*

418.    On or about December 28, 2000, Houldsworth spoke with Milton and Napier, who told him that AIG needed the first half of the transaction to be booked by year-end and that the Company would book it as a top-line entry.

419.    On or about December 28, 2000, Milton sent Houldsworth an email confirming AIG's participation in the first half of the transaction.

420.    On or about February 16, 2001, Monrad told Houldsworth that she had spoken to Defendant Smith, who told her that AIG booked the first half of the transaction in 2000.

421.    On or about February 16, 2001, Napier emailed Houldsworth and Monrad to inform them that Smith and Milton had decided that the most efficient way to transfer funds to General Re as a secret payment for the transaction would be to commute – *i.e.*, terminate – an unrelated transaction between General Re and HSB, an AIG subsidiary, which would result in General Re retaining $15 million that it otherwise was not entitled to keep.

422.    Napier's February 16, 2001 email also indicated that Smith and Milton said it was important for AIG to book the second part of the transaction during the first quarter of 2001.

423.    On or about March 8, 2001, Houldsworth sent Milton a signed copy of the sham contract for the first half of the "reserve" transaction, effective December 1, 2000 – *in other words, effective on a date that occurred before the contract had even been drafted* – which, by its false terms, provided that CRD would pay National Union a 2 percent, or $5 million, loss transfer payment.

424.    On or about April 2, 2001, AIG electronically filed with the SEC its Form 10-K for the year ending December 31, 2000. The 10-K included $250 million in phony reserves from the sham transaction between AIG and General Re.

425.    On or about May 15, 2001, AIG filed its First Quarter 2001 Form 10-Q.  The 10-Q included the second $250 million in phony reserves from the sham transaction between AIG and General Re.

426.    On or about August 21, 2001, Napier sent a letter to Milton, indicating that the two-stage reserve transfer had been completed and the only remaining issue was the transfer of funds so that General Re could be paid for its services in setting up the deal.

427.    On or about August 28, 2001, Milton sent Houldsworth a signed copy of the sham contract for the first half of the "reserve" transaction.

428.    On or about September 6, 2001, a CRD executive sent Milton a signed copy of the sham contract for the second half of the "reserve" transaction," effective March 31, 2001 – *in other words, effective on a date that occurred before the contract had even been drafted* – which, by its false terms, provided that CRD would pay National Union a 2 percent, or $5 million, loss transfer payment.

429.    On or about October 2, 2001, Milton sent a CRD executive a signed copy of the sham contract for the second half of the "reserve" transaction.

> iii.    **AIG And General Re Engage in Additional Transactions to Effectuate the Undisclosed Side Agreements That Concealed the True, Improper Nature of the AIG-General Re Deal**

430.    The Contracts' terms provided for General Re to pay AIG $10 million for the reinsurance; in fact, however, by executing several additional contracts, AIG and General Re were able to carry out their side agreement pursuant to which AIG would pay General Re a $5.2 million fee for the deal.  As alleged below, this was accomplished by AIG and General Re canceling an unrelated contract, pursuant to which General Re withheld $15.2 million in monies that it otherwise would have paid to AIG.  *Of that $15.2 million, General Re used $10 million*

*to "pay" AIG the fee set forth in the Contracts – in other words, AIG pre-funded the $10*

*million so that General Re paid nothing out of pocket.  General Re used the remaining $5.2*

*million as its undisclosed fee for agreeing to set up the AIG-General Re transaction.*

431.    In a telephone conversation on February 16, 2001, Monrad told Houldsworth that she had spoken to Defendant Smith, who said that AIG had already booked the first half of the transaction in 2000.  Smith had done so even though the mechanism for AIG to pre-fund the $10 million in "premiums" and to pay General Re the $5.2 million fee had not yet been agreed upon.

432.    That same day, Napier sent an email to Houldsworth and Monrad informing them that Smith and Milton had decided that the most efficient way to transfer the money to General Re would be to commute – *i.e.*, terminate – an unrelated transaction between General Re and an AIG subsidiary, HSB, leaving General Re with approximately $15.2 million that it otherwise would have returned to HSB.

433.    This "unrelated" transaction between General Re and HSB was not finalized until December 2001.  At the time, General Re held more than $30 million in an account that would be owed to HSB if the contract were commuted.  AIG and General Re decided to commute the HSB contract and distribute the proceeds from the account roughly as follows:  $7.5 million to HSB, $9.5 million to AIG/National Union and $15.2 million to General Re.

434.    The commutation agreement between General Re and HSB was executed on December 21, 2001, under which General Re was expressly obligated to pay HSB $7.5 million. To effect the transfers of the remaining $9.5 million to AIG without raising suspicions, on December 27, 2001, General Re and National Union executed a retrocession agreement ("General Re-National Union Contract") whereby National Union agreed to reinsure General Re for any losses General Re became obligated to pay under its reinsurance contract with HSB, the

contract that had just been commuted (meaning there could not possibly be any losses incurred under that contract). Under the General Re-National Union Contract, General Re paid National Union $9.5 million in "premiums" for a contract that had no purpose other than to mask the true reason for the transfer of these funds between General Re and AIG.

### g.  Effects of the Improper AIG-General Re Deal

435.   As Houldsworth and others at General Re anticipated, AIG accounted for the Contracts as if they were legitimate reinsurance contracts that transferred risk from General Re to AIG. By treating the Contracts as if they were real reinsurance contracts, AIG falsely inflated its reserves by $250 million and its premiums by $250 million in the financial statements contained in the Company's 2000 Form 10-K that AIG filed with the SEC on April 2, 2001. Likewise, AIG falsely inflated its reserves by an additional $250 million and its premiums by $250 million in the financial statements contained in the Company's First Quarter 2001 Form 10-Q that AIG filed with the SEC on May 15, 2001.

436.   Reflecting the impact of the First Contract, on February 8, 2001, AIG issued its fourth quarter 2000 earnings release in which Defendant Greenberg stated: "AIG had a very good quarter and year. . . .  We added $106 million to AIG's general insurance net loss and loss adjustment reserves for the quarter, and together with the acquisition of HSB Group, Inc., increased the total of those reserves to $25.0 billion at year-end 2000."

437.   Analysts reacted favorably to the added reserves and premiums, including one analyst who noted:

> We think this quarter was a good example of AIG doing what it does best: growing fast and making the numbers. The key takeaways were 20% local currency growth in international life premium equivalents, an increase from last quarter's 18.5% growth rate, and another acceleration of growth in nonlife insurance, with domestic general premiums growing 17.7% compared to 8.7% last quarter. ***As important was the change in reserves: AIG added***

> ***$106 million to reserves and the paid/incurred ratio fell to 97.1%,
> the lowest level since the first quarter of 1999.***
>
> ***Finally, AIG put to rest a minor controversy from last quarter by
> adding $106 million to reserves, worth 7.1 points on the
> combined ratio.***  This lowered the paid/incurred ratio to 97.1%, the
> lowest level since the first quarter of 1999.  For the full year,
> reserve increases were 2% of earned premiums for a paid/incurred
> ratio of 99.1%, down from 100.2% in 1999.

438.    On or about February 8, 2001, Dresdner Kleinwort Wasserstein analyst Kenneth

Zuckerberg noted that "AIG added to loss reserves during the quarter – the net change was $106

million – a clear positive from an earnings quality standpoint."  Similarly, Bear Stearns analyst

Michael Smith wrote:

> In past quarters, American International Group has received
> criticism from some corners regarding what has been viewed to be
> a rather small increase in loss reserves, but we believe there is little
> room for criticism on this score in the most recent quarter.  The
> company increased reserves by a total of $106 million . . . .

439.    Likewise, in AIG's first quarter 2001 earnings release issued on April 26, 2001,

Defendant Greenberg highlighted the claims reserves that the Company had added to its books:

> AIG had a solid first quarter, benefiting from a continuing
> strengthening of pricing in the commercial property casualty
> market, as well as strong performance by our overseas life
> insurance business and financial services businesses . . .
>
> ***We added $63 million to AIG's general insurance net loss and
> loss adjustment reserves for the quarter***, bringing the total of
> those reserves to $25.0 billion at March 31, 2001.

440.    AIG's earnings release that day was not an insignificant event – the Company

surprised the market by announcing that it had exceeded the consensus forecast among Wall

Street analysts by a penny a share.  It was the first positive surprise on earnings by AIG in a year.

441.     Analyst Smith of Bear Stearns pointed to AIG's increased claims reserves as a positive sign for the Company, writing that "the underlying quality of general insurance results also improved, evidenced by the increase in loss reserves . . . ."

442.     The impact of the $500 million AIG-General Re deal on the Company's financial statements was significant.  Without the fictional loss reserves added to AIG's balance sheet through the Contracts, AIG's reported loss reserves would have been $250 million less in the fourth quarter of 2000 and $500 million less in the first quarter 2001.  In other words, the $106 million increase to reserves that Defendant Greenberg trumpeted in AIG's fourth quarter 2000 earnings release was in reality *a $144 million decrease in reserves*, and the $63 million increase in reserves he highlighted in AIG's first quarter 2001 earnings release was in reality *a $187 million decrease in reserves* for that quarter alone, and a cumulative decrease of $331 million for the two quarters.

### h.     Regulatory Fallout From the AIG-General Re Deal

443.     On May 9, 2005, *The Wall Street Journal* reported that Defendant Napier had received a Wells notice from the SEC on May 2, 2005.

444.     On May 10, 2005, *The New York Times* reported that Monrad had also received a Wells notice from the SEC.

445.     On May 11, 2005, *The Wall Street Journal* reported that Defendant Houldsworth had also received a Wells notice from the SEC.

446.    On May 13, 2005, *The Wall Street Journal* reported that Defendant Houldsworth – who had also been notified by the Department of Justice that he was a target of an ongoing criminal investigation – had been placed on unpaid leave by General Re.[5]

447.    On May 20, 2005, Defendant Ferguson reportedly invoked his Fifth Amendment rights in response to questions from the SEC and DOJ.  As a result of Ferguson's decision to plead the Fifth, General Re terminated its consulting agreement with him, an arrangement that had been in place since October 2001, the month in which he resigned as CEO of the company.

448.    On June 6, 2005, General Re terminated Houldsworth after it learned that he had agreed to plead guilty in connection with charges brought against him in connection with his involvement in the AIG-General transaction.

449.    On June 6, 2005, the SEC initiated an enforcement action against Defendant Houldsworth by filing a civil complaint against him in the U.S. District Court for the Southern District of New York.  The SEC Complaint alleges that Houldsworth aided and abetted AIG in committing securities fraud, and noted:

> ***This case is not about the violation of technical accounting rules. It involves the deliberate or extremely reckless efforts by senior corporate officers of a facilitator company (Gen Re) to aid and abet senior management of an issuer (AIG) in structuring transactions, having no economic substance, that were designed solely for the unlawful purpose of achieving a specific, and false, accounting effect on the issuer's financial statements.***

450.    In partial settlement of the SEC's claims, Houldsworth – without admitting or denying guilt – consented to the entry of a partial final judgment: permanently enjoining him

---

[5]    That same article also reported that in late 2004, Houldsworth had been banned by Australian regulators from practicing in the insurance industry in Australia. That punishment had stemmed from several improper reinsurance transactions that Houldsworth negotiated and entered into with FAI, a now-defunct Australian insurer, that helped lead to that company's demise.

from future violations of the Exchange Act;  permanently barring him from serving as an officer or director of a public company; and deferring to a later date the determination of civil penalties and disgorgement.  In addition, Houldsworth consented to an SEC administrative order, based on the injunction, that bars him from appearing or practicing before the SEC as an accountant.

451.     Commenting on the case, Linda Chatman Thomsen, Director of the SEC's Division of Enforcement, said: **"AIG's fraud did not occur in isolation.  With this case, we are holding accountable an individual who, even though outside AIG, knowingly assisted the company to manipulate its financial results."**

452.     Likewise, Mark K. Schonfeld, Director of the SEC's Northeast Regional Office, said, "This is another step in our ongoing investigation into the abuse of insurance and reinsurance to falsify a company's financial results.  *Here the defendant helped to structure a sham transaction designed solely to enable AIG to achieve a specific, and false, accounting result*."

453.     On June 9, 2005, Houldsworth pled guilty in the U.S. District Court for the Eastern District of Virginia to one count of conspiring to file false financial reports, falsified books and records or to mislead auditors.  As part of his plea arrangement, Houldsworth agreed to cooperate with the United States Attorney's Office in the Eastern District of Virginia and the Department of Justice's Fraud Section in their ongoing investigations of AIG and General Re.  Sentencing is set for December 9, 2005, and Houldsworth faces up to five years in jail and fines of at least $250,000.

454.     One day later, on June 10, 2005 in the U.S. District Court for the Eastern District of Virginia, Defendant Napier also pled guilty to one count of criminal conspiracy to violate the

federal securities laws.  He too is scheduled to be sentenced on December 9, 2005 and faces up

to five years in jail and fines of at least $250,000.

456.     Also on June 10, 2005, the SEC initiated an enforcement action against Defendant

Napier by amending its earlier-filed complaint against Houldsworth to include Napier as a

defendant.  That action, styled as *SEC v. Houldsworth and Napier*, 05 Civ. 5325 (LAP) (the

"SEC Complaint"), alleges that Houldsworth and Napier aided and abetted AIG with respect to

its violations of Sections 10(b), 13(a), 13(b)(2) and 13(b)(5) of the Exchange Act.  Like

Houldsworth, Napier – without admitting or denying guilt – consented to the entry of a partial

final judgment against him:  permanently enjoining him from future violations of the above-cited

provisions; barring him from serving as an officer or director of a public company for five years;

and deferring to a later date the determination of civil penalties and disgorgement.  Napier also

agreed to assist the SEC in its continuing investigation.

456.     The government's investigation of the AIG-General Re deal may have ensnarled

yet another General Re executive – current CEO Joseph P. Brandon.  On June 7, 2005, *The Wall

Street Journal* reported that

> Mr. Houldsworth plans to tell investigators about the roles played
> by other senior General Re executives he said were involved in the
> transaction, including former Chief Financial Officer Elizabeth
> Monrad ***and current Chief Executive Joseph Brandon, to whom
> Ms. Monrad reported***, said a person familiar with the matter.

> Mr. Brandon isn't mentioned in the civil complaint [against
> Houldsworth].  In an interview with regulators in April, Berkshire
> Chairman and Chief Executive Warren Buffett said he and Mr.
> Brandon discussed General Re's accounting for the AIG deal
> several times but didn't go into details.

457.     On July 14, 2005, *The Wall Street Journal* reported more specifics into the

government's investigation into Brandon's possible role in, or knowledge about, the AIG-

General Re transaction:

*Officials are trying to determine what Mr. Brandon knew about the transaction – and when – including whether he knew AIG's reason for doing it.  They are also trying to determine whether Mr. Brandon knew of an opportunity to end the deal through a so-called commutation, and thus had deeper knowledge of the transaction.*

\*     \*     \*

One of the documents investigators are now examining is an October 2002 email – written roughly two years after the AIG contract was struck – by Mr. Houldsworth, who was then head of Cologne Re, a General Re unit based in Dublin.  In that email, which Mr. Houldsworth sent to four colleagues at General Re and Cologne Re but not to Mr. Brandon, Mr. Houldsworth referred to Mr. Brandon's alleged role in deciding whether to continue or unwind the AIG deal.

"Joe Brandon is meant [sic] to be discussing this with the client at the first opportunity," Mr. Houldsworth wrote in the email, a copy of which was reviewed by *The Wall Street Journal*.  The email added:  "We obviously would like to either commute [as we are entitled], or be paid an additional fee for continuing.  At this point I agree we should leave this with Joe but continue to follow up periodically in case it gets forgotten."

\*     \*     \*

Investigators are also asking questions about a series of conversations between Messrs. Brandon and Buffett in which Mr. Buffett asked Mr. Brandon about General Re's accounting for the AIG deal, people close to the situation say.  After checking into General Re's accounting for the deal, Mr. Brandon reported back to Mr. Buffett in a later conversation that the accounting was proper, these people say.

\*     \*     \*

Investigators are drilling into how much detail Mr. Brandon learned about the AIG deal around the time of the conversations with Mr. Buffett.  Mr. Brandon asked for paperwork on the AIG deal, but he told investigators he didn't review the paperwork, people close to the matter say.

\*     \*     \*

- 129 -

> ***Another document, dated Oct. 31, 2000, suggests Mr. Brandon offered advice on how to structure the AIG transaction.***[6]  That document, included in Mr. Spitzer's civil complaint, lists in point-form Mr. Ferguson's and Mr. Brandon's suggestions on how to structure the deal, referring to the executives by their initials. After the initials JPB, which several people familiar with the document say refers to Mr. Brandon, are various suggestions including:  "May be best to stay away from U.S. companies to avoid large fluctuations in our reported reserves.  Use non-U.S. entities. KR Dublin?"
>
> KR Dublin refers to Cologne Re, which eventually took part in the transaction.  According to the note, Mr. Brandon also suggested "funds withheld," a method of accounting for some reinsurance transactions that was also eventually employed by General Re in accounting for the AIG deal.

458.    On September 9, 2005, *Bloomberg.com* reported that Brandon had received a Wells Notice from the SEC on September 8, 2005 in connection with his role in the AIG-General transaction.  On September 12, 2005, *The Wall Street Journal* reported that the SEC alleges that Brandon "violated or aided and abetted violations" of the securities laws.

459.    At least two additional current and former General Re executives received Wells notices from the government.  On September 12, 2005, the same *Wall Street Journal* article reported that, "[i]n addition to Mr. Brandon, Robert Graham, General Re's assistant general counsel, and Christopher Garand, a former General Re executive who resigned Aug. 31, also were told by regulators they are likely to face civil charges for similar violations, Berkshire said."

---

[6]    *See* paragraph 378 *supra*.