UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| In Re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation | MDL No. 1668 |
| In re Fannie Mae Securities Litigation | Consolidated Civil Action, No. 1:04-cv-1639 (RJL) |

**DECLARATION OF KAVITA KUMAR PURI IN SUPPORT OF
NON-PARTY DELOITTE & TOUCHE LLP'S RESPONSE
IN OPPOSITION TO LEAD PLAINTIFFS' MOTION TO COMPEL**

Kavita Kumar Puri deposes and states, pursuant to 28 U.S.C. § 1746:

1. I am an associate in the Litigation practice of Arnold & Porter LLP.

2. Since March 2007, in my capacity as an associate, I have been involved in the effort of Deloitte & Touche LLP ("Deloitte") to produce documents in response to the third party subpoenas issued to it relating to the above-captioned litigation.

3. Two parties have issued subpoenas to Deloitte with respect to the above-captioned litigation: Franklin D. Raines, represented by Williams & Connolly LLP, and Lead Plaintiffs, co-represented by Berman DeValerio Pease Tabacco Burt & Pucillo ("Berman DeValerio") and Waite, Schneider, Bayless and Chesley Co., L.P.A. As of this date, Deloitte has produced approximately 19,946 pages in response to a subpoena issued to it by Williams & Connolly, and approximately 103,581 pages of hard copy workpapers and 192,220 pages of electronic workpapers in response to the subpoena issued by Berman DeValerio, co-counsel for Lead Plaintiffs.

4. Upon information and belief, Deloitte was retained in early 2004 to assist the Office of Federal Housing Enterprise Oversight ("OFHEO") Special Examination. In early 2005, Deloitte became Fannie Mae's auditors and discontinued its OFHEO engagement. These two engagements--the OFHEO engagement and the Audit engagement--generated documents potentially responsive to the subpoenas.

***OFHEO Engagement Material***

5. In late March and early April of 2007, my colleague, Sarah Sorg, Esq., and I reviewed the hard files retained by Deloitte from its OFHEO engagement for privileged and/or confidential/proprietary information. Deloitte produced 13,091 pages of these documents to Daniel Marx at Williams and Connolly on April 9, 2007.

6. On April 6, 2007, I forwarded, via electronic mail, to Alex Romaine of Williams & Connolly an index of the Deloitte OFHEO Special Examination "e-room" containing electronic files relating to the engagement. Sometime thereafter, Mr. Marx forwarded a copy of the index to me with the documents he sought for production highlighted. On April 25, 2007, Deloitte produced an additional 6,855 pages of documents to Williams & Connolly.

7. Although these materials were produced by Deloitte by April 25, 2007, we have since been informed by Mr. Marx that they may not have been posted to the parties shared database until approximately one month later.

8. We are continuing to review certain documents for responsiveness and privilege.

*Audit: Final Hardcopy Workpapers of the Year-End 2004 Restated Financial Statements*

9. Upon information and belief, Deloitte's Fannie Mae audit team needed the final hard copy workpapers from the 2004 year-end audit in order to conduct the 2005 audit.

10. As soon as that audit was completed, Deloitte shipped its final hardcopy workpapers to a warehouse to be catalogued and stored.

11. In the first week of May, Ms. Sorg and I went to Deloitte's offices in McLean, Virginia to determine which materials should bear the legend "ATTORNEYS' EYES ONLY" as per a list provided to us by Deloitte. We also reviewed the documents to determine which, if any, should be withheld on the basis of privilege. To confirm our designation system, we visited the McLean, Virginia office a second time the following week.

12. On May 11, 2007, at my request, IKON Office Solutions, Inc. ("IKON") collected the final hard copy workpapers from the McLean, Virginia office. At that time, IKON estimated that it would take them approximately two weeks to scan all the images to tiff, and add Bates-stamp numbers and the appropriate confidentiality legends.

13. On May 14, 2007 I called Julie Richmond of Berman DeValerio to explain that IKON needed approval from them regarding the billing arrangements before they could begin processing the documents for production.

14. It was not until May 21, 2007 that I was told, by Ms. Richmond and separately by IKON, that they had been unable to negotiate an approved rate for scanning these documents, and that Deloitte would have to send them to Xerox. As of that date,

IKON was charging 14 cents per page to scan the documents to group IV, multi-page tiff images and to appropriately stamp the documents, while Xerox was reportedly charging 7 cents to do the same. Based on the number of boxes, IKON estimated that there were about 90,000 pages in the production, which meant that the 7 cent difference amounted to a price differential of $6,400.

15. During that May 21st conversation with Ms. Richmond, I informed her that Deloitte was unwilling to send its original documents to an unfamiliar vendor with which it had no experience, and that I would contact IKON and attempt to negotiate a lower rate that might be acceptable to plaintiffs.

16. On May 22, 2007, I called Ms. Richmond to inform her that IKON decreased its rate to 10 cents per page--just 3 cents off Xerox's reported rate. This amounted to an estimated difference of $2,700 to be split amongst the parties. I informed her that it would, in fact, cost more than that to have copies made of the material and shipped to plaintiffs so that Xerox could process those documents. Nonetheless, Ms. Richmond informed me that she would have to obtain group approval before allowing IKON to move forward.

17. On the afternoon of May 25, 2007--the Friday before Memorial Day weekend--I received a voicemail and e-mail from Autumn Smith at Berman DeValerio informing me that the parties had finally agreed to pay for IKON's services. Although I contacted IKON immediately thereafter to inform them that the work had been authorized, IKON was unable to obtain the required approval from Berman DeValerio until after the holiday, on Tuesday, May 29.

18. On Tuesday, May 29, I informed Ms. Smith that she would receive a significant portion of the hard copy workpapers by Monday, June 4.

19. From June 5 through June 14, Deloitte produced approximately 103,500 pages of materials from the final hard copy audit workpapers. Deloitte has not produced 46 CDs and 1 DVD of material that were part of the final hard copy workpapers, which Mr. Block indicated he would like preserved but not produced at this time.

***Audit: Final Electronic Workpapers of the Year-End 2004 Restated Financial Statements***

20. On March 16, Leslie Wharton, a partner at Arnold & Porter, LLP, and I participated in a call which included representatives from Xerox Legal Services, Solutions Plus+, and Deloitte & Touche to discuss the format in which Deloitte should produce its final electronic workpapers. Deloitte informed the parties that because its workpapers are maintained on a proprietary system--the AS/2 system--that they would first need to be converted in such a way as to allow production. This data would have to be transferred and then the data would have to be extracted and converted to tiff images. Deloitte explained that certain documents, particularly the Microsoft Excel documents, would have to be reformatted by hand in order to make the tiff images readable.

21. Xerox explained that as long as the working papers were produced in a single-page tiff image format with group IV compression and an appropriate load file, producing in this manner would be acceptable.

22. The parties agreed that Solutions Plus+ would first formulate a pricing proposal, which would then be reviewed for approval by the parties.

23. Deloitte received the proposal from Solutions Plus+ on March 30, 2007, forwarded it to Ms. Wharton, and then reviewed it.

24. After Deloitte approved the proposal, I forwarded the letter to Mr. Block at Berman DeValerio on April 3, 2007.

25. Mr. Block sent Ms. Wharton a letter via e-mail at 1:25 pm on April 3 requesting final resolution of the price proposal, but I had sent him a letter earlier that day at 1:07 pm, forwarding him the proposal.

26. On April 13, Mr. Schreiber and I participated in a teleconference with Jeffrey Kilduff from O'Melveny & Meyers LLP and Mr. Block to discuss the reasonableness of the proposal by Solutions Plus+. Mr. Block indicated that he thought the price was fine, but that he needed to check whether it would be cheaper for Xerox to provide the OCR for the tiff images. The project was to begin only upon receiving confirmation from Mr. Block that Solutions Plus+ should commence the processing and that it should not provide the OCR field for these documents.

27. Since April 18, when Mr. Block finally approved the costs for Solutions Plus+ and decided that Xerox should provide the OCR, it is my understanding that Solutions Plus+ has been working diligently to extract the relevant files and convert them to tiff images along with certain preparer and reviewer information that accompany each file.

28. On the May 29 phone call with Ms. Smith, I endeavored to explain that there were technological problems, which I did not and do not have the technical expertise to fully understand, outside the control of Solutions Plus+ and Deloitte that both the vendor and Deloitte were working diligently to resolve. I further explained that we anticipated, at that time, that the first batch of these documents would be ready within ten days or so of that conversation. I attempted to tell Ms. Smith that these documents would

be from the first part of the audit workpaper index, namely the 1000 series, but it appears from Ms. Smith's Declaration dated May 29, 2007 that she misunderstood my representation.

29. On June 19, 2007 we sent approximately 47,000 pages of this material.

30. I understand from Solutions Plus+ that we are hopeful of producing the remainder of these documents by July 27, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of July in Gardner, Montana.

_____
Kavita Kumar Puri